448 S.E.2d 165

**Susan Argabrite SHEARER, Plaintiff Below, Appellant,**

v.

**Dan L. SHEARER, IV, Defendant Below, Appellee.**

**No. 21666.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1994.

Decided July 18, 1994.

Dissenting Opinion of Justice NEELY July 22, 1994.

Rehearing Denied Aug. 26, 1994.

Richard A. Bush, Bush & Trippel, Parkersburg, for appellant.

Robin Jean Davis, Segal & Davis, Charleston, and William J. Leon, Gianola, Leon & Barnum, Morgantown, for appellee.

## PER CURIAM:

This is an appeal by Susan A. Shearer from an order of the Circuit Court of Monongalia County awarding custody of her three-year-old child to the child's father, Dan L. Shearer, IV. The award of custody was made in conjunction with a divorce proceeding. On appeal, the appellant contends that the award of custody was improper and prays that this Court reverse the decision of the circuit court. After reviewing the questions presented and the documents filed, this Court agrees. Accordingly, the judgment of the Circuit Court of Monongalia County is reversed, and this case is remanded with directions that the circuit court award the appellant custody of the parties' child.

On September 1, 1989, the appellant and Dan L. Shearer, IV, were married in Monongalia County, West Virginia. Approximately six months prior to the marriage, the parties had had the infant child whose custody is in issue in the present proceeding.

Following their marriage, the parties lived together in Morgantown, West Virginia, with the infant child.

In January, 1992, the appellant filed a complaint for divorce in the Circuit Court of Monongalia County. In the complaint she alleged that irreconcilable differences had arisen between herself and Dan L. Shearer, IV, or, in the alternative, that Dan L. Shearer, IV, had been guilty of cruel and inhuman treatment. She sought custody of the parties' infant child, an award of child support, an award of alimony, and equitable distribution of the marital assets of the parties. In support of her claim for custody of the infant child, she alleged that she had been the primary caretaker of the child, who was then three years old.

Dan L. Shearer, IV, filed an answer in which he admitted that irreconcilable differences had developed between the parties. He, however, denied that the appellant had been the primary caretaker of the infant child, and he demanded custody of the infant child, an award of child support, and distribution of marital assets of the parties in conformity of the terms of an existing prenuptial agreement.

Following the filing of the complaint, a preliminary hearing was conducted in the matter on February 11, 1992. At the conclusion of that hearing, the family law master who conducted it equally divided the temporary care, custody, and control of the infant child between the parties. He scheduled a final hearing in the matter for March 30, 1992, and he awarded the appellant custody of the child for half of the intervening time, with weekend visitation to Dan L. Shearer, IV, and he awarded Dan L. Shearer, IV, custody for the remaining half of the intervening period of time, with weekend visitation to the appellant. The family law master also required each custodial parent to permit the noncustodial parent the first option of babysitting in lieu of daycare or third-party babysitting.

Final hearings in the matter proceeded as scheduled. The first session was conducted on March 30, 1992. Two later sessions were conducted on May 11 and May 15, 1992.

During the final hearings, both parties admitted that the other was involved to a considerable degree in the care of the infant child. Differences arose over the relative extent or degree of that involvement.

At the conclusion of the final hearings, the family law master found that both parties were fit parents and also found that during their marriage both parties were actively involved in the rearing of the infant child and that, therefore, neither party had established that he or she was entitled to the benefit of the primary caretaker presumption for the purposes of determining custody of the child. The family law master went on to state:

> After further inquiry into the relative degrees of parental competence, the Law Master finds that it is in the best interest of the child of the parties that custody be awarded to the Defendant. In this regard, the Law Master finds that the Defendant

is a life long resident of Morgantown; has completed his graduate school education and is now gainfully employed in Morgantown, West Virginia; that the Defendant has both paternal and maternal relatives living in the Morgantown area; and that between the Plaintiff and Defendant, Defendant is better able to financially support the child. The Law Master finds that Plaintiff has not yet completed her graduate school education; that her future employment and living arrangements are uncertain at present. For these and such other reasons as appear on the record, the Law Master finds that it is in the best interest of the child that custody be awarded to the Defendant.

It appears that at the conclusion of the hearings in the case, the appellant, through her counsel, sought to present rebuttal evidence. Without objection from Dan L. Shearer, IV, the family law master refused to hear such rebuttal evidence and declared the case submitted.

Since the appellant was denied the opportunity to present rebuttal evidence at the final hearing, through counsel she sought an alternative procedure to place her rebuttal evidence before the circuit court which had responsibility for making the final decision in the case. She, accordingly, served notice of the taking of her own deposition, and despite objections from Dan L. Shearer, IV, the deposition was taken on June 3, 1992.

Both parties filed petitions for review of the recommended order of the family law master, and in conjunction with her appeal, the appellant attempted to submit the deposition.

After reviewing the questions raised on appeal, the circuit court found that both parties appear to have shared equally in the raising of their son, and, in view of this finding, the court concluded that it was appropriate for the master to find that neither party was entitled to the primary caretaker presumption. The court also found that the family law master's finding that Dan L. Shearer, IV, was better suited to care for the parties' child could not be viewed as being the result of an abuse of discretion. Accord-

ingly, the court, in effect, adopted the family law master's findings.

In the present proceeding, the appellant claims that the trial court erred in confirming the findings of fact and conclusions of law of the family law master to the effect that neither party was entitled to the primary caretaker presumption and that the best interest of the child would be served by an award of custody to the child's father, Dan L. Shearer, IV. She claims that this was especially so when the family law master refused to permit her to offer rebuttal evidence and the court refused to consider her post-hearing deposition offered in lieu of rebuttal evidence.

The appellant also argues that the evidence of the case was overwhelming that she was the primary caretaker of the infant child and the overwhelming weight of the evidence showed that the best interest of the child would have been promoted by an award of custody to her.

In *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), this Court discussed at some length the award of custody of a child of tender years. Under the principles set forth in *Garska*, the three-year-old child of the parties in the present case would clearly qualify as a child of tender years.

The fundamental rule set forth in *Garska* for the award of custody of a child of tender years is summarized in syllabus point 2, as follows:

> With reference to the custody of very young children, the law presumes that it is in the best interests of such children to be placed in the custody of their primary caretaker, if he or she is fit.

In syllabus point 3 of *Garska v. McCoy*, the Court defined the primary caretaker as follows:

> The primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child.

In *David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989), the Court, following *Garska v. McCoy*, outlined the criteria to

be used in determining which parent has been the primary caretaker of a child of tender years. The Court stated that the primary caretaker was the parent who:

> ... has taken primary responsibility for, *inter alia*, the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.

182 W.Va. at 67, 385 S.E.2d at 923.

In the present case, the evidence adduced demonstrated that the appellant, who was not married to the appellee until six or seven months after the infant child of the parties was born, remained at home and cared for the parties' infant child during the first six months of the child's life. The evidence on who was the primary caretaker of the child after the first six months of the child's life is somewhat conflicting. The appellant testified that she did approximately thirty percent of the cooking in the home, while the appellee did approximately seventy percent of the cooking. However, the evidence also shows that the parties and the infant child seldom ate at home. Instead, it suggests that they ate most of their meals out. The appellant testified that she did the majority of the shopping, and the appellee did not refute this testimony, although there was evidence that he did, from time to time, stop at the grocery store to pick something up. Additional evidence showed that, for the first year or so after the birth of the infant child, the appellant did the bathing and grooming of the child. According to the appellant, during this period the appellee

stated that "I don't do baths." When the child became older, the child would often take a shower with his father, but on these occasions the appellant would undress the child and hand him to his father, who was at the time in the shower.

In her testimony, the appellant did not mention the purchase of clothing for the child. The appellee, on the other hand, testified that he had bought clothing for the child. However, the testimony of Sarah Jo Scolopio, an individual who worked with the appellant, indicated that the appellant often left work early in the afternoons to go shopping for clothing. Testimony regarding who did the laundry was essentially conflicting.

The evidence relating to the medical care of the child showed that the appellant started taking the child to a pediatrician shortly after birth and later took the child to the pediatrician on a continuing basis. This testimony was given by Dr. Ferrari, the pediatrician. Dr. Ferrari did, however acknowledge that the appellee had on occasion delivered the child.

The evidence relating to the social interaction of the child indicated that most of his social interaction was with the appellee's family. There is no question that the arranging of this interaction was done by the appellee. However, affecting the question of social interaction was the fact that the child was very young and was not, in fact, involved in the interaction-type of functions which slightly older children participate in.

The evidence also rather clearly showed that the appellee did most of the arranging of child care for the parties' child. The appellee's family had a financial interest or connection with a child care center, and this center was the primary place used for alternative child care.

The evidence on who put the child to bed at night and attended to him at night was sketchy. The evidence relating to discipline and toilet training was somewhat conflicting. It appears that the parties disagreed about disciplining and toilet training, but the testimony of the appellant was that until the child was toilet trained, she was the one who

changed the infant's diapers, even when both parties were in the home.

The evidence on education was also somewhat conflicting. The appellee took the child to movies and read such material as sports magazines to him. The appellant, on the other hand, suggested that she was involved with the education of the child. When the divorce proceeding was initiated, the child had just reached the age of three years old. At that point, he obviously had not received much education in elementary skills.

In examining the evidence adduced in this case, this Court believes that it rather clearly shows that for the first six months of the child's life, or for approximately one-sixth of the child's life prior to the institution of the divorce proceedings, the appellant was clearly the primary caretaker of the child. Thereafter, while the child was in diapers, the appellant generally changed the diapers, and until he became somewhat older, she bathed him. Even after the appellee became involved with bathing the child, the appellant continued to participate in that function. The evidence further suggests that the appellant· was primarily responsible for the health care of the child.

There is some conflict in the evidence of who purchased clothing for the child and who prepared meals.

In reviewing the factors to be considered in who was the primary caretaker, as stated in *David M. v. Margaret M. supra*, it is apparent that certain of those factors are involved in the care of all young children, from the youngest infant on, whereas other of the factors become significant only as the child becomes slightly older. Obviously, meals, dressing, bathing, and medical care, and attending to a child at night, are factors involved with the care of all children. Other things, such as teaching reading, writing, and arithmetic, education in terms of religious, cultural and social values, the teaching of general manners, and many aspects of social interaction are not factors which are profoundly significant in the care of extremely young infants.

This Court believes that the evidence in the present case shows that the parties' infant child was very young at the time the divorce proceeding was initiated. He, in fact, had only just arrived at his third birthday.

Under the circumstances, the Court believes that the appropriate focus in addressing the question of who was the primary caretaker should be which party performed the most basic functions necessary to the care of very young children, such things as medical care, feeding, bathing, etc. Factors such as arranging boy scout meetings are less relevant.

In this Court's view, the evidence rather clearly shows that the appellant was the one most closely involved with the primary functioning of the parties' infant child prior to the initiation of the divorce proceedings in this case. For the first six months of the child's life, the appellant appears to have been almost the exclusive caretaker. As outline above, thereafter she was deeply involved with the general care of the child, as well as his medical care.

Although the evidence suggests that the appellee was a caring father, and that as the child grew older the appellee paid attention to the disciplining of the child and to arranging rudimentary social interaction and that he became more involved with the child, this Court believes that a fair reading of the evidence suggests that the appellant was, in fact, the primary caretaker.

As previously indicated, *Garska v. McCoy, supra*, indicates that where a primary caretaker is fit, the law presumes that it is in the best interests of a very young child to be placed in the custody of that primary caretaker.

There was no evidence introduced in this case that indicates that either of the parties was an unfit parent. Given the overall circumstances of the case, the Court believes that the trial court erred in holding that neither party was the primary caretaker and in awarding custody to the appellee.

For the reasons stated, the judgment of the Circuit Court of Monongalia County is reversed, and this case is remanded with directions that the circuit court enter an order awarding the appellant custody of the parties' infant child. The Court notes that

the evidence demonstrates that the appellee was a fit and caring parent. Under the circumstances, the Court believes that he should be awarded liberal visitation privileges.

Reversed and remanded.

NEELY, Justice, dissenting:

(Filed July 22, 1994)

There is a disturbing lack of honesty about this Court's treatment of custody issues. The playing field is simply not level, but is banked against fathers. The family law master, after listening to all the evidence first hand, found that Dan Shearer, IV, should be given custody. The Circuit court reviewed the evidence presented and concluded that there had not been an abuse of discretion by the family law master, and accordingly affirmed the custody ruling in Mr. Shearer's favor.

Then this Court steps in and goes through elaborate contortions to reverse the lower court's ruling and grant custody to the mother. Yet, in a case argued before this court on the same day, *Dancy v. Dancy*, 191 W.Va. 682, 447 S.E.2d 883 (1994), the majority essentially deferred to the decision of the Circuit court in adopting another family law master's recommendation giving custody to Mrs. Dancy—a recovering alcoholic. In *Dancy*, although the Court acknowledged that the record showed that Mrs. Dancy's alcoholism had interfered with her ability to supervise the child, we nonetheless upheld custody in Mrs. Dancy's favor, concluding that no abuse of discretion by the lower court occurred.

How is it that this Court in *Dancy, supra* at 682, 447 S.E.2d 883, can justify awarding custody to a recovering alcoholic by citing to Syl. pt. 2, *Funkhouser v. Funkhouser*, 158 W.Va. 964, 969, 216 S.E.2d 570, 573 (1975):

The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused: however,

where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal.

then, turn around and reverses a lower court ruling despite an admission that "[t]here was no evidence introduced in this case that indicates either of the parties was an unfit parent"! *Shearer*, at 169. If there was no evidence that Mr. Shearer was unfit, then the lower court's ruling in his favor surely couldn't be "clearly wrong".

Mrs. Shearer admitted that Mr. Shearer did the grocery shopping, laundry, and cooking, as well as being actively involved in his son's toilet training, discipline, educational, and social activities.[1] Mr. Shearer did all these things while completing a master's degree. He was able to list his son's preference for certain foods, showed awareness of special dietary requirements, used special detergents for his son's clothing because of skin sensitivity, and knew his son's favorite books.[2]

Furthermore, Mr. Shearer's extended family lives in Morgantown including his father, grandparents, siblings, and cousins, and routinely interacted with Mr. Shearer and his son. Father and son participated in family gatherings on holidays, summers at the lake, sporting events, and other informal activities. This provided his son with playmates, role models, and an extended support network providing enhanced stability and security.

There was no similar evidence of the child's participation in family gatherings with Mrs. Shearer's parents or siblings. In fact, Mrs. Shearer's sister lived in Morgantown but never even attended a dinner at the Shearer home.[3] The majority decision removes a five year old child from the familiar surroundings of his family and grandparents, with whom he has lived exclusively for the past two years, and places him with his mother. A mother who now resides out of state and only visited on weekends. Sending

---

1. Response brief of respondent, Dan L. Shearer, IV, in opposition to the petition for appeal, p. 13, March 26, 1993.

2. *Id.* at 23.

3. Brief of Appellee, Dan L. Shearer, IV, p. 23–24 (April 1, 1994).

this child out of state, to live with Mrs. Shearer away from his father and extended family with whom he spent almost two thirds of his life, cannot be in his best interests.[4]

The simple truth is that there is a rampant gender bias that has clouded the majority's ability to render impartial decisions in the area of family law.[5] This case, and the majority decision in *Dancy*, are indicative of a disturbing trend that needs to be investigated by the newly formed West Virginia Task Force on Gender Bias. For further discussion of how gender bias hurts society as a whole and does a grave disservice to all people, see my dissent in *Metzner v. Metzner*, 191 W.Va. 378, 446 S.E.2d 165 (1994).

In the children's book by Dr. Seuss, *Horton Hatches the Egg*, Horton the elephant devotedly sat on a bird's nest while Mayzie, a lazy bird, went on an extended vacation returning months later, when the egg was hatching and demanded custody. The ele-

phant prevailed, and in the words of Dr. Suess:

"And it should be, it *should* be, it SHOULD be like that!
Because Horton was faithful! He sat and he sat!
... And they sent him home
Happy,
One hundred per cent!

(emphasis in original)

Mr. Shearer sat on the "nest" alone for the past two years, and this court sent him home empty handed. I have no doubt that "but for" Mr. Shearer's gender, the outcome in this case would have been different, and for this reason I dissent.

---

4. *Id.* at 39.

5. This would appear to be the outraged rantings of an irate male but when the prevailing gender bias in America went the other way and favored men, it was I who wrote *The Primary Caretaker Parent Rule*, 111 YALE L. & POL'Y REV. 168 (Fall 1994), which summarizes the technique men employ to terrorize women with threats of custody cases to exact economic concessions in divorce cases. *See also, J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978), *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981) (describing the primary care taker rule).