MICHAEL GARSKA

*v.*

GWENDOLYN MCCOY[1]

(No. 14962)

Decided May 26, 1981.

---

[1] This case was incorrectly styled upon papers presented by counsel to this Court. In order to prevent confusion we have styled the case: *Michael Garska, Appellee v. Gwendolyn McCoy,* Appellant. The case was presented to us styled as follows: *Stergil Altizer, et al., Plaintiffs Below v. Jonathan Conway McCoy, Defendant Below, Michael Garska, Appellee, Stergil Altizer, et al. etc., Defendants Below, Gwen McCoy, Intervenor, Gwendolyn McCoy, Appellant.* This peculiar styling arose because of the factual situation discussed *infra.* Since our Court and the lower court have treated this case as a custody dispute we suggest that the natural mother, Gwendolyn McCoy and the natural father, Michael Garska, should be the named parties to the action on remand.

*Raymond F. Crooks* for appellant.

*Baer, Napier & Colburn and James Allan Colburn* for appellee.

NEELY, JUSTICE:

The appellant, Gwendolyn McCoy, appeals from an order of the Circuit Court of Logan County which gave the custody of her son, Jonathan Conway McCoy, to the appellee, Michael Garska, the natural father. While in many regards this is a confusing case procedurally, since the mother and father were never married, nonetheless it squarely presents the issue of the proper interaction between the 1980 legislative amendment to *W. Va. Code*, 48-2-15 [1980] which eliminates any gender based presumption in awarding custody and our case of *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978) which established a strong

maternal presumption with regard to children of tender years.

In February, 1978 the appellant moved from her grandparents' house in Logan County, where she had been raised, to Charlotte, North Carolina to live with her mother. At that time appellant was 15 years old and her mother shared a trailer with appellee, Michael Garska. In March, Gwendolyn McCoy became pregnant by Michael Garska and in June, she returned to her grandparents' home in West Virginia.

The appellant received no support from the appellee during her pregnancy, but after she gave birth to baby Jonathan the appellee sent a package of baby food and diapers. In subsequent months the baby developed a chronic respiratory infection which required hospitalization and considerable medical attention. Gwendolyn's grandfather, Stergil Altizer, a retired coal miner, attempted to have his great-grandson's hospitalization and medical care paid by the United Mine Workers' medical insurance but he was informed that the baby was ineligible unless legally adopted by the Altizers.

In October, 1979 Gwendolyn McCoy signed a consent in which she agreed to the adoption of Jonathan by her grandparents, the Altizers. Upon learning of the adoption plan, the appellee visited the baby for the first time and began sending weekly money orders for $15. The Altizers filed a petition for adoption in the Logan County Circuit Court on 9 November 1979 and on 7 January 1980 the appellee filed a petition for a writ of habeas corpus to secure custody of his son.

Both the adoption and the habeas corpus proceedings were consolidated for hearing and the circuit court dismissed the adoption petition upon finding that the baby had not resided with the Altizers for the requisite six months before the filing of the petition, under *W.Va. Code*, 48-4-1(c) [1976], since Gwendolyn McCoy had moved away from their home for a short period. The circuit court heard testimony from three witnesses on the father's petition to be awarded custody of the child and then adjourned the

hearing without a decision. The hearing on the habeas corpus petition resumed on 27 May 1980 and the circuit court awarded custody of Jonathan McCoy to the appellee based upon the following findings of fact:

(a) The petitioner, Michael Garska, is the natural father of the infant child, Johathan Conway McCoy;

(b) The petitioner, Michael Garska, is better educated than the natural mother and her alleged fiance;

(c) The petitioner, Michael Garska, is more intelligent that the natural mother;

(d) The petitioner, Michael Garska, is better able to provide financial support and maintenance than the natural mother;

(e) The petitioner, Michael Garska, can provide a better social and economic environment than the natural mother;

(f) The petitioner, Michael Garska, has a somewhat better command of the English language than the natural mother;

(g) The petitioner, Michael Garska, has a better appearance and demeanor than the natural mother;

(h) The petitioner, Michael Garska, is very highly motivated in his desire to have custody of the infant child, and the natural mother had previously executed an adoption consent, for said child.

The appellant asserts the following errors: (1) the circuit court failed to apply the tender years presumption in favor of the mother articulated in *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978) and earlier cases since it was the operative rule of law at the time the pleadings were filed; (2) the circuit court established and applied arbitrary and inappropriate standards to determine the relative fitness for custody of the parties; and (3) the circuit court erroneously refused to allow the petitioner to withdraw her "consent for adoption" even though the adoption petition itself had been dismissed.

While the issue of adoption by the Altizers does, indeed, enter into this case, in the final analysis the entire dispute comes down to a custody fight between the natural father and the natural mother. Although *Code,* 48-2-15 [1980] is concerned with the award of custody in a *divorce* proceeding, that section is the preeminent legislative expression of policy concerning custody between natural parents in that it abolishes all gender based presumptions and establishes a "best interest of the child" standard for the award of custody. The final order was entered after the operative date of the 1980 Amendment to *W.Va. Code,* 48-2-15, the relevant part of which provides:

> In making any such order respecting custody of minor children, there shall be no legal presumption that, as between the natural parents, either the father or the mother should be awarded custody of said children, but the court shall make an award of custody solely for the best interest of the children based upon the merits of each case.

Furthermore, the case was tried below on the theory that *Code,* 48-2-15 [1980] applies to this case to the extent that it obliterates the presumption of *J.B. v. A.B., supra,* that children of tender years should be awarded to the mother.

This Amendment was enacted in response to *J.B. v. A.B.,* where we said in syl. pt. 2:

> In a divorce proceeding where custody of a child of tender years is sought by both the mother and father, the Court must determine in the first instance whether the mother is a fit parent, and where the mother achieves the minimum, objective standard of behavior which qualifies her as a fit parent, the trial court must award the child to the mother.

In the case before us the father, by providing fifteen dollars a week child support, probably showed sufficient parental interest to give him standing to object to an adoption.[2] However, there is no evidence before us to

---

[2] *W.Va. Code,* 48-4-1(a)(2) [1976] says that a determined father means any person who "has acknowledged his parental status by contribut-

indicate that the mother was an unfit parent and, consequently, no justification for the trial court to remove custody from the primary caretaker parent and vest it in a parent who had had no previous emotional interaction with the child.

## I

It is now time to address explicity the effect which the strong presumption in favor of the primary caretaker parent articulated in *J.B. v. A.B.*, *supra* has upon the equity of divorce and child custody dispositions. In this regard we must be concerned not only with those disputes which are decided by trial judges in court but also with all those cases which are settled outside of court in reliance on the rules we generate.

The loss of children is a terrifying specter to concerned and loving parents; however, it is particularly terrifying to the primary caretaker parent who, by virtue of the caretaking function, was closest to the child before the divorce or other proceedings were initiated. While the primary caretaker parent in most cases in West Virginia is still the mother, nonetheless, now that sex roles are becoming more flexible and high-income jobs are opening to women, it is conceivable that the primary caretaker parent may also be the father. If the primary caretaker parent is, indeed, the father, then under *W.Va. Code*, 48-2-15 [1980] he will be entitled to the alimony and support payments exactly as a woman would be in similar circumstances. *Peters v. Narick*, 165 W.Va. 662, 270 S.E.2d 760 (1980).

Since the parent who is not the primary caretaker is usually in the superior financial position, the subsequent welfare of the child depends to a substantial degree upon the level of support payments which are awarded in the course of a divorce. Our experience instructs us that

---

ing to the child's support" and *W.Va. Code*, 48-4-1(b)(1) says that "[i]n the case of a child sought to be adopted, the written consent, duly acknowledged, of the mother and father (in the case of an illegitimate child, the mother and determined father) or the surviving parent of such child sought to be adopted must be obtained."

uncertainty about the outcome of custody disputes leads to the irresistible temptation to trade the custody of the child in return for lower alimony and child support payments. Since trial court judges generally approve consensual agreements on child support, underlying economic data which bear upon the equity of settlements are seldom investigated at the time an order is entered. While *Code,* 48-2-15 [1980] speaks in terms of "the best interest of the children" in every case, the one enormously important function of legal rules is to inspire rational and equitable settlements in cases which never reach adversary status in court.[3]

If every controversy which arose in this society required court resolution, the understaffed judiciary would topple like a house of cards. It is only voluntary compliance with the criminal law and the orderly settlement of private affairs in the civil law which permits the system to function at all. Consequently, anytime a new statute is passed or a new rule of common law developed, both legislators and judges must pay careful attention to interpreting it in a way which is consonant with equity in the area of private settlements.

Syl. pt. 2 of *J.B. v. A.B.,* *supra,* attempted to remove from most run-of-the-mine divorce cases the entire issue of child custody. Certainly if we believed from our experience that full-blown hearings on child custody between two fit parents would afford more intelligent child placement than an arbitrary rule, we would not have adopted an arbitrary rule. However, it is emphatically the case that hearings do not enhance justice, particularly since custody fights are highly destructive to the emotional health of children. Furthermore, our mechanical rule was really quite narrowly drawn to apply only to those cases where voluminous evidence would inevitably be unenlightening. We limited the mechanical rule to the custody of children who are too young to formulate an opinion concerning their own custody and, further, we limited it to cases where an initial

---

[3] For a complete discussion of this proposition see Mnookin & Kornhauser, "Bargaining in the Shadow of the the Law: The Case of Divorce," 88 Yale L.J. 950 (1979).

determination had been made that the mother was, indeed, a fit parent. While in *J.B. v. A.B.*, *supra*, we expressed ourselves in terms of the traditional maternal preference, the Legislature has instructed us that such a gender based standard is unacceptable. However, we are convinced that the best interests of the children are best served in awarding them to the primary caretaker parent, regardless of sex.

Since trial courts almost always award custody to the primary caretaker parent anyway, establishment of certainty in this regard permits the issues of alimony and support to stand upon their own legs and to be litigated or settled upon the merits of relevant financial criteria, without introducing into the equation the terrifying prospect of loss to the primary caretaker of the children. As we noted in *J.B. v. A.B.*, *supra*, at 242 S.E.2d 255, "empirical findings directly or indirectly relevant to questions for which judges deciding difficult [custody] cases need answers are virtually nonexistent. Okpaku, Psychology: Impediment or Aid in Child Custody Cases? 29 Rutgers L.R. 1117, 1140 (1976)." The 1980 Amendment to *Code*, 48-2-15 was not intended to disturb our determination that in most instances the issue of child custody between two competent parents cannot be litigated effectively. Its intent was merely to correct the inherent unfairness of establishing a gender-based, maternal presumption which would defeat the just claims of a father if he had, in fact, been the primary caretaker parent.

## II

In setting the child custody law in domestic relations cases we are concerned with three practical considerations. First, we are concerned to prevent the issue of custody from being used in an abusive way as a coercive weapon to affect the level of support payments and the outcome of other issues in the underlying divorce proceeding. Where a custody fight emanates from this reprehensible motive the children inevitably become pawns to be sacrificed in what ultimately becomes a very cynical game. Second, in the average divorce proceeding intelligent determination of relative degrees of fitness requires a precision of measure-

ment which is not possible given the tools available to judges. Certainly it is no more reprehensible for judges to admit that they cannot measure minute gradations of psychological capacity between two fit parents than it is for a physicist to concede that it is impossible for him to measure the speed of an electron.[4] Third, there is an urgent need in contemporary divorce law for a legal structure upon which a divorcing couple may rely in reaching a settlement.

While recent statutory changes encourage private ordering of divorce upon the "no-fault" ground of "irreconcilable differences," *W.Va. Code,* 48-2-4(a)(10) [1977], our legal structure has not simultaneously been tightened to provide a reliable framework within which the divorcing couple can bargain intelligently. Nowhere is the lack of certainty greater than in child custody. Not very long ago, the courts were often intimately involved with all aspects of a divorce. Even an estranged couple who had reached an amicable settlement had to undergo "play-acting" before the court in order to obtain a divorce. Now, however, when divorces are numerous, easy, and routinely concluded out of court[5] intelligible, reliable rules upon which out-of-court bargaining can be based must be an important consideration in the formulation of our rules.

Since the Legislature has concluded that private ordering by divorcing couples is preferable to judicial ordering, we must insure that each spouse is adequately protected during the out-of-court bargaining. Uncertainty of outcome is very destructive of the position of the primary caretaker parent because he or she will be willing to

---

[4] According to the Heisenberg Principle in Physics it is impossible to assert in terms of the ordinary conventions of geometrical position and of motion that a particle (as an electron) is at the same time at a specified point and moving with a specified velocity for the more accurately either factor can be measured the less accurately the other can be ascertained.

[5] "Typically, the parties do not go to court at all, until they have worked matters out and are ready for the rubber stamp." Friedman & Percival, *A Tale of Two Courts:* Litigation in Alameda and San Benito counties, 10 Law & Soc'y Rev. 267, 270 (1976), *quoted in Mnookin & Kornhauser supra* n.2.

sacrifice everything else in order to avoid the terrible prospect of losing the child in the unpredictable process of litigation.

This phenomenon may be denominated the "Solomon syndrome", that is that the parent who is most attached to the child will be most willing to accept an inferior bargain. In the court of Solomon, the "harlot" who was willing to give up her child in order to save him from being cleaved in half so that he could be equally divided, was rewarded for her sacrifice,[6] but in the big world out there the sacrificing parent generally loses necessary support or alimony payments.[7] This then must also be compensated for "in the best interests of the children." Moreover, it is likely that the primary caretaker will have less financial security than the nonprimary caretaker and, consequently, will be unable to sustain the expense of custody litigation,[8] requiring as is so often the case these days, the payments for expert psychological witnesses.

Therefore, in the interest of removing the issue of child custody from the type of acrimonious and counter-productive litigation which a procedure inviting exhaustive evidence will inevitably create, we hold today that there is a presumption in favor of the primary caretaker parent, if he or she meets the minimum, objective standard for being a fit parent as articulated in *J.B v. A.B.*, *supra*[9] regardless of sex. Therefore, in any custody dispute involving children of tender years it is incumbent upon the

---

[6] 1 Kings 3:16 *et. seq.*

[7] There is very little hard evidence to support this theory that parents use the specter of custody proceedings to gain leverage in financial settlements. An interview transcript on file with the *Yale Law Journal* with the Assistant Clerk of New Haven County Superior Court at p.7 (Dec. 17, 1977) attests to the frequency of fathers using threats of a custody battle to gain a reduction in alimony. *See* Note, "Lawyering for the Child", 87 *Yale Law Journal* 1126, 1131 n. 21 (1978).

[8] For a discussion of decision making by the parties to litigation, *see* Galanter, "Why the 'Haves' Come Out Ahead: Speculatories or the Limits of Legal Change", 9 Law & Soc'y Rev. 95 (1974).

[9] As we said in *J.B. v. A.B.*, *supra*, where the primary caretaker fails to provide: emotional support; routine cleanliness; or nourishing food, the presumption shall not apply.

circuit court to determine as a threshold question which parent was the primary caretaker parent before the domestic strife giving rise to the proceeding began.

While it is difficult to enumerate all of the factors which will contribute to a conclusion that one or the other parent was the primary caretaker parent, nonetheless, there are certain obvious criteria to which a court must initially look.[10] In establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for, *inter alia,* the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the

---

[10] The Oregon Supreme Court has also relied upon a determination of the primary caretaker parent in reaching custody decisions. That court awarded custody to a mother when: "The undisputed evidence in this case was that the wife was not merely the mother but was also the primary parent. During the marriage she was not working and performed the traditional and honorable role of homemaker. She cleaned the house, cared for the children, fed the family, nursed them when sick and spent those countless hours disciplining, counseling and chatting with the children that every homemaker should. For some families the husband may perform this role and be the primary parent. In other families the parents evenly divide the role and there is no primary parent. In this family the husband played the traditional role of breadwinner, working eight to ten hours a day. In his off-hours he dedicated much time and attention to the children, but the lion's share of the child raising was performed by the wife. It is undisputed that the children were happy and well-adjusted and that the relationship between the wife and children was close, loving and successful. Although the same relationship unquestionably existed to a degree with the husband, the close and successful emotional relationship between the primary parent and the children coupled with the age of the children dictate the continuance of that relationship." *Derby and Derby,* 31 Or. App. 803, 806-7, 571 P.2d 562, 1080 (1977), *modified on other grounds,* 31 Or. App. 1333, 572 P.2d 1080 (1977), *rev. den.* 281 Or. 323 (1978).

middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.

In those custody disputes where the facts demonstrate that child care and custody were shared in an entirely equal way, then indeed no presumption arises and the court must proceed to inquire further into relative degrees of parental competence. However, where one parent can demonstrate with regard to a child of tender years that he or she is clearly the primary caretaker parent, then the court must further determine only whether the primary caretaker parent is a fit parent. Where the primary caretaker parent achieves the minimum, objective standard of behavior which qualifies him or her as a fit parent, the trial court must award the child to the primary caretaker parent.

Consequently, all of the principles enunciated in *J.B. v. A.B., supra,* are reaffirmed today except that wherever the words "mother," "maternal," or "maternal preference" are used in that case, some variation of the term "primary caretaker parent," as defined by this case should be substituted. In this regard we should point out that the absolute presumption in favor of a fit primary caretaker parent applies only to children of tender years. Where a child is old enough to formulate an opinion about his or her own custody the trial court is entitled to receive such opinion and accord it such weight as he feels appropriate. When, in the opinion of the trial court, a child old enough to formulate an opinion but under the age of 14 has indicated a justified desire to live with the parent who is not the primary caretaker, the court may award the child to such parent.

### III

In the case before us it is obvious that the petitioner was the primary caretaker parent before the proceedings under consideration in this case arose, and there is no finding on the part of the trial court judge that she is an unfit parent.

In fact, all of the evidence indicates that she mobilized all of the resources at her command, namely the solicitous regard of her grandparents, in the interest of this child and that she went to extraordinary lengths to provide for him adequate medical attention and financial support. While, as the trial court found, the educational and economic position of the father is superior to that of the mother, nonetheless, those factors alone pale in comparison to love, affection, concern, tolerance, and the willingness to sacrifice—factors about which conclusions can be made for the future most intelligently upon a course of conduct in the past. At least with regard to the primary caretaker parent there is a track record to which a court can look and where that parent is fit he or she should be awarded continued custody.

Certainly the record in the case before us does not demonstrate any intent by the mother to abandon the child through permitting him to be adopted by the grandparents; it is well recognized that mothers in penurious circumstances often resort to adoption in order to make the child eligible for social security or union welfare benefits, all of which significantly enhance the child's opportunities in life. Absent an explicit finding of intent to abandon we cannot construe manipulation of the welfare system to direct maximum benefits towards this child as anything other than a solicitous concern for his welfare.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Logan County is reversed and remanded with directions to enter an order in favor of the petitioner.

*Reversed and remanded.*