314 S.E.2d 67 (1984)
J.E.I.
v.
L.M.I.
No. 15987.
Supreme Court of Appeals of West Virginia.
Submitted January 11, 1984.
Decided March 2, 1984.
*68 Leo Catsonis, Charleston, for appellant.
Joseph G. Martorella, Marjorie Martorella, Martorella & Martorella, Huntington, for appellee.
NEELY, Justice.
The husband, appellee in this action, and wife, appellant, were married in December 1977. In June of 1979 a son was born to the couple. The parties separated in September 1981 when the wife left West Virginia and returned to Brooklyn, New York as a result of severe mental illness. In September 1981 the husband filed for divorce in Cabell County on grounds of irreconcilable differences and cruel and inhuman treatment. The wife did not answer the complaint or in any other way appear in the Circuit Court of Cabell County. Because service of process was properly achieved through publication and mail, the circuit court awarded the husband a divorce *69 in November 1981 and gave him custody of the son.
In March, 1982 the wife petitioned for a rehearing and the parties agreed that the circuit court would hear the issue of child custody and that the legal standard to be applied would be the same as if no decision had previously been made concerning custody. The circuit court found that the best interests of the son would be served by leaving him in the custody of his father. We find that the circuit court applied the correct standard and did not abuse its discretion. Therefore we affirm.

I
The appellant married the appellee when she was nineteen. At the time of her marriage she was living with her parents in Brooklyn, New York. Testimony about her childhood is relevant to the case before us because at the time of the hearing in the circuit court the appellant was living with her parents and she indicated that if the court awarded her custody she would raise her son in her parents' home.
Witnesses testified that the circumstances surrounding the appellant's childhood in her parents' home caused her a great deal of pain. She complained that there was never enough food in the house, that the house was not heated in the wintertime, and that her home was lifeless and austere. The appellant's mother often told her as she was growing up that she had the devil in her, and that she was crazy. She described her parents' marriage as unhappy and indicated that her father gambled, drank and had a violent temper.
In March 1980 the parties left New York City to settle in an area they believed was better for raising children. Initially the couple moved to Ohio where the husband was employed at an educational facility for retarded children and other children with special needs. In August 1980, the family moved to Spurlock Creek in West Virginia and the wife began working at a local Pizza Hut.
There is no question that at the time their son was born the wife assumed primary responsibility for his care. When the wife began working at Pizza Hut, she cared for the son during the husband's working hours and the husband cared for him during the wife's working hours. Sometime before Christmas in 1980 the appellant quit her job at Pizza Hut and at the same time she began to suffer severe emotional problems that impaired her functioning in her daily life. She began a gradual process of withdrawal from the infant child who was then about eighteen months old. This deterioration in her mental state became progressively worse over the next few months. The appellant provided less and less physical care, found it difficult to provide appropriate emotional responses, and finally was unable to provide any emotional support for the child. As she withdrew from the child, the appellee gradually took over the responsibility of providing for the son's needs.
By June of 1981 appellant was completely withdrawn from her son. She stayed up long hours at night, sleeping most of the day. When her husband returned home from work in the evenings she still had not dressed for the day and was in her night clothes. She left her son in a playpen. The only attention she appeared to give to the child's physical needs was to open prepared cans of baby food so that the child could eat. When the appellant spoke to her son it was in impatient, raised tones and sometimes with profanity. When the appellee returned home in the evenings his son appeared untended and unkempt, and was usually in need of a clean diaper.
Thus, by May or June of 1981, the father was providing all of the active care for the child. He did all of the shopping and household chores; he did all the meal preparation; he did all the laundry; he did the bathing and reading to the child in the evening; he changed the diapers and toilet-trained the child; and it was he who took the child on excursions out of the home.
The appellant continued to deteriorate until she broke down completely on 14 August 1981. She disappeared with her son *70 and her husband reported to the police that they were missing that evening. The appellant was located the following day, Saturday, at about 3 p.m., in the parking lot of the 10th Avenue YMCA in Huntington. She had spent the night in the parking lot waiting for a nonexistent person, whom she explained was a "tall, dark, handsome, young doctor named Mark Walsh who was terribly rich. He was madly in love with me." The wife said that the imaginary Doctor Walsh was to be her husband in a future life. The son was returned to his father and his wife came home Saturday evening.
Throughout that weekend the appellant continued to exhibit bizarre and deluded behavior, lying in the bathtub in the fetal position. That same weekend a friend of the appellant was visiting from New York. Appellant said that the child was her friend's baby now and that the friend and the appellee were going to get married and take care of the child. Sunday night the appellant laughed to herself on and off throughout the night. Midday on Monday the 17th, the child approached his mother who was holding a package of Parmesan cheese. The appellant offered the child some cheese and when he held out his hand for it she threw it all on the floor. At that point the appellee took his wife to St. Mary's Hospital to have her admitted to the psychiatric ward.
The appellant was treated at St. Mary's hospital by Doctor D.H. Webb. The initial diagnosis was acute psychotic disorder. The final diagnosis was hysterical conversion disorder dissociative type: in other words, that the defendant was not truly psychotic, but had withdrawn from reality and had developed a delusional system. Dr. Webb said that he was unable to get an adequate history concerning the source of appellant's problem because as soon as she felt stress, she diverted the conversation to a tangent concerning her imaginary future husband.
The appellant remained in St. Mary's Hospital until 4 September 1981. At about that time her father came to St. Mary's to obtain her discharge and take her home to Brooklyn, New York. Although Doctor Webb stated that the appellant would be better served by remaining in the hospital, she signed out and returned to her parents' home in New York. Dr. Webb strongly advised appellant to seek therapy in New York because she needed further care, but she did not do so. The appellant moved around in New York for about three weeks staying with different friends. At one point she had an apartment with another woman and was paying half the rent and working.
In November 1981 the appellant attempted suicide and was hospitalized at Methodist Hospital in Brooklyn. After her hospitalization she sought outpatient therapy at the Baltic Street Mental Health Center in Brooklyn, but when her therapist left the medical center she stopped therapy and sought no further psychiatric help or counseling.
In early December 1981, approximately a month after the parties were divorced, the appellant visited the appellee and her son in Huntington. The couple talked about their son's custody and agreed at that time not to fight over custody and that the child should remain with his father. The appellant had consulted a lawyer. Later, of course, the appellant changed her mind and as a result the hearing that is the subject of this appeal was held.
At the time of the hearing on permanent custody the appellant was employed as a typist at the Guardian Life Insurance Company in the Wall Street area of Manhattan. Her father was employed as a waiter. Her mother, who had been employed for many years as a housecleaner, was temporarily unemployed. At the hearing the appellant testified that her mother would care for the child during her working hours. Although she admitted that she had been cold and hungry growing up in the same family, she averred an intent to provide additional money for food and the fuel bills so that the same fate would not befall her son. The appellant testified, however, that it was her intention to remain in her parents' *71 home in Brooklyn. According to the appellant's description, she and her child would occupy two rooms on the third floor that were separate from the rest of the household.
At the time of the custody hearing the appellee and his son were living in a seven-room apartment on the ground floor of a three-floor brick house. The home is near Ritter Park in Huntington, and the child has a large back yard with a wading pool, along with adequate space to play and ride his tricycle. The record provides overwhelming evidence that the son's environment with his father is excellent and that the appellee is a superior, loving and emotionally supportive father. One neighbor described the appellee as "the most dedicated father I have ever seen" and even the appellant does not disparage the appellee's capacity as a parent.

II
The primary ground for appeal is that the circuit judge inappropriately applied the primary-caretaker-parent rule to this case. The appellant maintains that her mental illness was precipitated by the appellee's inconsiderate, emotionally unsupportive and abusive behavior, and that since she lost her position as primary-caretaker parent as a result of a mental illness, the court should not consider the fact that the appellee was the primary caretaker immediately before the divorce complaint was filed against her.
We agree with the appellant that under circumstances where the status of primary-caretaker parent has been lost temporarily as a result of circumstances that are beyond the control of that parent it is inappropriate for a court to look to who the primary-caretaker parent was immediately before the divorce. If a parent who has borne the bulk of parental responsibility for years is temporarily disabled by an automobile accident, for example, it would be unfair both to that parent and to the children to apply the primary-caretaker parent presumption announced by this court in Garska v. McCoy, W.Va. 278 S.E.2d 357 (1981), against the disabled parent and look only to who was acting as primary caretaker for a short period immediately before the divorce complaint is filed.
The circuit court's decision in this case, however, was not predicated upon the primary-caretaker parent rule. The circuit court's order merely recites as a factual matter that the father was the primary-caretaker parent from the late spring of 1981 until the time of the hearing. In fact, the trial court applied the correct standard because the court further found in its order that the wife was not capable of taking care of the infant child or herself at the time of the divorce and that the evidence did not show a change of circumstances that would warrant a change of custody or that a change of custody would promote the best interests of the child. We believe the record supports this finding.
In Garska v. McCoy, supra, we pointed out that occasionally there would be circumstances where both parents shared child-raising duties equally. Although the case before us does not fit neatly into either the primary-caretaker-parent presumption category, nor into the category that we envisioned in Garska where both parents simultaneously share caretaker responsibilities, the case is closer to the second category than to the first. Furthermore, it is difficult to evaluate the reasons that the appellant relinquished the care of her son to her husband. If this were a case where the appellant had been incapacitated by an automobile accident and laid up involuntarily in a hospital for six months, we could say that she still had the right to the benefit of the primary-caretaker presumption. Alternatively, had the appellant knowingly and deliberately abandoned her son for a six-month period forcing her husband to become the primary-caretaker parent, her husband would be able to avail himself of the primary-caretaker doctrine. Because the appellant was suffering from a psychological problem at the time of divorce, however, it is impossible to determine the extent to which her actions were *72 voluntary and the case is therefore a novel one.
We believe that the trial court adopted a sensible approach to this difficult situation. In cases where a parent who had formerly acted as primary-caretaker parent is, for reasons beyond his or her control, unable to continue in that role immediately before the initiation of divorce proceedings, temporary child custody should be awarded to the parent who is currently acting as primary caretaker. However, the court should allow a de novo hearing on the issue of child custody when and if the parent who is disabled at the time of divorce recovers. The standard that should govern the child custody decision at such a hearing is the best interests of the child.[1] Some of the factors that the court should consider in reaching its determination concerning the best interests of the child include: (1) the comparative fitness of the two parents; (2) the length of time during which the parent who had not been disabled at the time of divorce had retained temporary custody; and (3) the likelihood that the disability that afflicted one parent at the time of divorce will recur and again leave that parent unable to be the primary caretaker.
In setting out this list of criteria, we do not pretend to be exhaustive. Furthermore, we are well aware that innumerable variables can be considered in reaching a determination on the comparative fitness of parents. Experience with the child, temperament, physical environment and free time are only a few of the obvious considerations. We do not wish to limit arbitrarily the discretion of trial courts in making what is inherently a fact-intensive and individualized judgment.
We would note, however, that a claim made by the appellant in this case which is likely to recur in such cases is that her disability was caused directly by the appellee's conduct. Because the relevant issue is the best interests of the child and not the relative degrees of fault between former spouses, a trial court should not consider whether the parent who received temporary child custody was responsible for the other parent's disability unless that fault is relevant to the individual's fitness as a parent.
A few comments are also necessary regarding the proper consideration to be given to the length of time that a parent has enjoyed temporary custody. Voltaire once noted that there is nothing so permanent as a temporary relationship. In cases where temporary custody extends for a period of several years it would be unwise and detrimental to the child's best interests to transfer custody unless there is a change of circumstance that makes it in the child's best interest to effect a change. Indeed, we believe that after a sufficient lapse of time it is usually in the best interest of the child to award permanent custody to the custodial parent if the disabled parent has not sought a hearing. In recognizing this fact, however, we do not mean to condone a system in which one parent deliberately delays adjudication of permanent custody to enhance his or her likelihood of getting custody.
Finally, judges may not always believe it is possible to make a definitive judgment on the comparative fitness of parents. In such cases, the fact that one parent has maintained custody of a child for a substantial period should weigh heavily in that parent's favor. We are not in the business of making moral judgments about which parent is more to blame for the circumstances that lead to a temporary change in primary-caretaker status; but unfortunately we are all too often in the business of deciding which of two imperfect environments is more suitable for a child. Both psychological studies and common *73 sense inform us that continuity gives children a sense of security and warmth.[2] Therefore, we hold that in cases where the court is unable to determine that one parent is more fit than the other, custody should be left with the parent who had temporary custody. In this way we at least foster stability.
In the case before us, although the appellant asserts that she has been cured of her mental illness, the evidence does not unambiguously support that conclusion. Dr. Webb testified that during the course of an hour interview with her at the time she was in Huntington for the hearing in this case she displayed no psychotic symptoms and could "probably" deal with the pressure of raising a child. On the other hand, evidence does demonstrate that on at least two occasionswhen she took her son and spent the night in the parking lot of the YMCA and when she attempted suicide in New Yorkthe appellant's mental illness produced symptoms that would be life-threatening for her son if they recurred. Because Dr. Webb indicated that the appellant had little tolerance for medication and was reluctant to follow his advice and seek continued professional help, those risks seem all too real.
The trial court was correct in its conclusion that regardless of the relationship between the appellant and appellee and the fact that the appellee's actions might have been a contributing cause of the appellant's mental disorder, the best interests of the childmost particularly his physical safety were served by keeping him in the custody of his father. Consequently, we find that the trial court applied the correct standard of law and did not abuse its discretion in its evaluation of the evidence.
For the reasons set forth above, the judgment of the Circuit Court of Cabell County is affirmed.
Affirmed.
NOTES
[1] This rule is limited to complicated cases like the one before us. Obviously, if a parent who has been primary caretaker for many years is incapacitated by a broken leg or the need to undergo routine medical treatment like a gallbladder operation, the temporary assumption of primary caretaker responsibilities by the other parent would not be sufficient to vitiate the presumption in favor of the regular primary caretaker.
[2] The conclusion of a noted legal authority and two psychoanalysts who made a systematic study of the effects of child custody decisions on the welfare of children are particularly apposite on this point:

Continuity of relationships, surroundings and environmental influence are essential for a child's normal development. Since they do not play the same role in later life, their importance is often underrated by the adult world.
Physical, emotional, intellectual, social, and moral growth does not happen without causing the child inevitable internal difficulties. The instability of all mental processes during the period of development needs to be offset by stability and uninterrupted support from external sources. Smooth growth is arrested or disrupted when upheavals and changes in the external world are added to the internal ones.
J. Goldstein, A. Freud & J. Solnit, Beyond the Best Interests of the Child 31-32 (1973).