408 S.E.2d 394

**James R. STARKEY, Jr., Plaintiff Below, Appellant,**

v.

**Martha Ann STARKEY, Defendant Below, Appellee.**

**No. 19633.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 8, 1991.

Decided July 29, 1991.

Rehearing Denied Sept. 5, 1991.

---

Jolyon W. McCamic, McCamic & McCamic, Wheeling, for appellant.

Michael W. McGuane, Haranzo & McGuane, Wheeling, for appellee.

PER CURIAM:

The appellant, James R. Starkey, Jr., appeals from a March 29, 1990, final order of the Circuit Court of Marshall County granting custody of his three children to their natural mother, appellee Martha Ann Starkey. The appellant contends that he is entitled to custody of the children, James R. Starkey, III, Andrew Jacob Starkey, and Adrianne Lynn Starkey.[1]  Upon review of

1. Since the filing of this action, the oldest of the three children, James R. Starkey, III, has reached age 18 and has become emancipated. Consequently, this appeal will resolve only the

the record, we find that the trial court erred in awarding custody to the appellee. Accordingly, we reverse the trial court's award of custody to the appellee and remand this case with directions that the custody of the children be awarded to the appellant and with further directions that the appellee be awarded extensive and meaningful visitation rights.

## I.

James and Martha Starkey were married on November 14, 1970, and the marriage produced three children, James R. Starkey, III, born in 1971, Andrew Jacob Starkey, born in 1979, and Adrianne Lynn Starkey, born in 1980. It is undisputed that the appellee was the primary caretaker of the children until July 1985. On the evening of July 29, 1985, the family, residing in Marshall County, West Virginia, was packed and prepared to leave on vacation the next morning. Sometime during the night, unbeknownst to the children or the appellant, the appellee left the home. It was not until approximately ten days later that the appellee contacted her family and informed them that she had travelled to Lexington, Kentucky, with a friend, Ms. Thelma Brown.

On approximately September 7, 1985, the appellee returned to her family for three days and then moved in with Ms. Brown, leaving the children with their father. The appellee contends that she and her husband agreed that it would be beneficial to live apart while they attended marriage counselling and attempted to reconcile. During their visits to therapist Wayne Dickison, the parties were informed that the appellant's drinking problems contributed to their marital strife. In January 1986, the appellant admitted himself into Marietta Alcohol Treatment Center in order to seek assistance in overcoming the alcohol problem. The children resided with the appellee at the home of Ms. Brown during that twenty-one day treatment period. The appellant testified that he has not consumed any alcohol since his treatment.

Subsequent to the appellant's release from the treatment center, he resumed custody of the children in the marital home until May 1986. At that time, the appellee took the younger two children, and the oldest child remained with the appellant. The appellee contends that the change in custody was based upon an agreement between the parties after the appellant experienced difficulty in obtaining babysitting services. The appellant contends, however, that while babysitting problems had been discussed, the appellee took the children without his knowledge while he was working and refused to return them. In any event, the appellant filed for divorce in August 1986 wherein he sought to regain custody of the two younger children.

Pursuant to an agreed order dated August 22, 1986, temporary custody of the younger two children was granted to the appellee, and temporary custody of the oldest child was granted to the appellant. In the temporary custody hearing held on January 26, 1987, before Family Law Master Gary Rymer, the appellee testified that she left the family home in July 1985 because she did not want to be "cooped up" with her husband during the planned vacation. The family law master found that the appellant was the primary caretaker at the time the action was filed and granted temporary custody of all three children to the appellant.

A final custody hearing was held on November 3, 1988, before Family Law Master Rymer. During this hearing, the appellee testified that the actual reason for her departure from the home in July 1985 was her fear that she would lose control of her emotions and harm her children. Two clinical therapists at the Wheeling Clinic, Wayne Dickison and Ronni Rittenhouse, testified on her behalf and stated that she suffered from a mental condition resulting from her status as a child of an alcoholic parent.[2] The oldest child chose to be

---

custody of the two younger children, Andrew and Adrianne.

2. The appellee allegedly suffers from a condition known as ACOA, Adult Children of Alcoholics. Therapist Wayne Dickison explained that the condition is

placed in the custody of the appellant, and the family law master found that the appellant was entitled to the primary caretaker presumption. Thus, the family law master awarded all three children to the appellant. The family law master also held that the "abandonment of the children in July of 1985 by the ... [appellee] abandoned any prior existing primary caretaker status...." Moreover, the family law master found that even absent the consideration of primary caretaker, the best interests of the children would dictate that they be placed with the appellant. Upon review of the family law master's decision by the circuit court, the circuit court adopted the recommendation of the family law master and awarded custody of the children to the appellant by order dated April 26, 1989.

The appellee petitioned for review, and the circuit court, by order dated August 30, 1989, vacated its previous order granting custody to the appellant. On March 29, 1990, the circuit court held that the threshold issue was which parent was primary caretaker at the time of the institution of the action and found that the appellee was primary caretaker at that time.[3] For that reason, the circuit court refused to adopt the recommendations of the family law

master and granted custody of the children to the appellee. Upon appeal of that decision by the appellant, we stayed the order of the lower court pending our final decision.

## II.

This Court has repeatedly held that custody of children of tender years should be awarded to the primary caretaker of those children. In syllabus point 2 of *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), we stated the following: "With reference to the custody of very young children, the law presumes that it is in the best interest of such children to be placed in the custody of their primary caretaker, if he or she is fit." In syllabus point 3 of *Garska* we explained that "[t]he primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child." 167 W.Va. at 59, 278 S.E.2d at 358. In *Garska*, we enumerated several duties which are encompassed within the definition of primary caretaker. These include such basic caretaking duties as preparation of meals, grooming, medical care, discipline, and education.[4] *Id.* 167 W.Va. at 69–70, 278

characterized by feelings of loss of control, powerlessness, inability to relate closely with other human beings. It's characterized by what is called dichotomous thinking, that is all or nothing thinking; not that we can negotiate, not that we can reach out to each other, not that there is a gray area in which we must exist, but it's an I'm right and you're wrong, and there's no way we can reconcile that. It is very debilitating as an adult for an individual because they have no real skills with which to pursue a relationship.

In explaining the appellee's motivation to depart the family home in July 1985, Ms. Rittenhouse testified as follows:

But the thing I remember most was that she was developing a fear that she was going to not be able to maintain herself psychologically any longer, she was going to blow up, which does happen to ACOA's. They keep everything in until they can't keep it in any more, and then they blow up. Sort of like a pressure cooker with that little steam valve. And she was afraid she was going to take it out on the children....

 . . . .

 ... She was afraid she was going to hurt the kids, and she didn't know what else to do.

3. The lower court, in its March 29, 1990, order, stated that "[t]he threshold issue to be determined is which parent was the primary caretaker of the children at the time of the institution of this action," and concluded that the appellee was the "primary caretaker of the minor children at the time of the filing of this action and for some period of time prior thereto, and further that the ... [appellee] is the proper person to be awarded custody of the minor children...."

4. *Garska* specifically set forth the following examples of duties of a primary caretaker:
 (1) [P]reparing and planning of meals;
 (2) [B]athing, grooming and dressing;
 (3) [P]urchasing, cleaning, and care of clothes;
 (4) [M]edical care, including nursing and trips to physicians;
 (5) [A]rranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings;
 (6) [A]rranging alternative care, i.e. babysitting, day care, etc.;
 (7) [P]utting child to bed at night, attending to child in the middle of the night, waking child in the morning;

S.E.2d at 363.

A determination of who is the primary caretaker of a child, however, cannot be determined simply by reference to any one moment of time. It is not merely a snapshot in time taken on the day the divorce proceedings are initiated that governs the primary caretaker determination. In the present case, the lower court, in reversing the conclusion of the family law master, based its finding that the appellee was the primary caretaker of the two younger children on the fact that she had had possession of them for approximately three months prior to the time the divorce proceedings were initiated. We disagree with the lower court's conclusion to the extent that it implies that the primary caretaker determination is made on the basis of which parent has custody at the particular time the divorce proceeding is filed. *Garska* and its progeny did not restrict the time frame of the inquiry to the issue of which parent had possession on that particular day or for any limited time prior thereto. The determination of primary caretaker is a task which must encompass, to some degree, an inquiry into the entirety of each child's life, with obvious emphasis on the more recent period of time.

In the present case, we do not agree that the appellee was the primary caretaker until the initiation of the divorce proceedings. She did have physical possession of the two younger children on the day the divorce papers were filed, but the circumstances preceding that date must also be scrutinized. She had departed from the family home on the night before the family had planned to leave for a vacation. She had not informed her husband or her children of her middle-of-the-night departure or her whereabouts until approximately ten days after she left, returning for approximately three days and then moving in with a friend. Approximately four months later, she consented to caring for the children while her husband attended a twenty-one day alcohol treatment program. It was not until approximately ten months after her initial departure from the home that she indicated interest in regaining custody of her children. Even at that time, as discussed above, the record is unclear with regard to whether the appellee actually desired custody of her children or simply consented to caring for the two younger children while her husband experienced problems with babysitting services. During the seven-month period in which the appellee cared for the two younger children, the appellant filed the divorce proceedings. Under circumstances existing in the present case, we cannot agree with the lower court's conclusion that the appellee was the primary caretaker of the children until the initiation of the divorce proceedings.

Moreover, the lower court's determination of the issue of primary caretaker is not in complete accord with our decision in *J.E.I. v. L.M.I.*, 173 W.Va. 194, 314 S.E.2d 67 (1984). In *J.E.I.*, we encountered a situation wherein a mother had been the primary caretaker of a young child until the mother developed a severe emotional disorder. As a result of the emotional problems suffered by the mother, the father undertook the primary caretaker duties. 173 W.Va. at 196, 314 S.E.2d at 69. In syllabus point 1 of *J.E.I.*, we held that "[u]nder circumstances where the status of primary-caretaker parent is lost as the result of circumstances that are beyond the control of the parent, it is inappropriate for a court to look to who the primary-caretaker parent was immediately before the initiation of divorce proceedings." *Id.* 173 W.Va. at 195, 314 S.E.2d at 68. We further stated that temporary custody in such cases should be awarded to the parent who is not under any disability and that a de novo hearing on the issue of child custody should be held if and when the disabled parent recovers. *Id.* 173 W.Va. at 198–199, 314 S.E.2d at 72. The standard governing that proceeding must be the best interests of the child. *Id.* Once the disabled parent

(8) [D]isciplining, i.e. teaching general manners and toilet training;
(9) [E]ducating, i.e. religious, cultural, social, etc.; and,

(10) '[T]eaching elementary skills, i.e. reading, writing and arithmetic.'
167 W.Va. at 69–70, 278 S.E.2d at 363.

recovers, the following factors are among those to be considered by a court in determining the best interests of the child:

(1) the comparative fitness of the two parents;

(2) the length of time during which the parent who had not been disabled at the time of divorce had retained temporary custody; and,

(3) the likelihood that the disability that afflicted one parent at the time of the divorce will recur and again leave that parent unable to be the primary caretaker.

*Id.*

█ Thus, where one parent's primary caretaker status is lost as a result of circumstances beyond that individual's control, as the appellee claims in the present case, the primary caretaker determination is not to be made as of the initiation of divorce proceedings. Pursuant to our decision in *J.E.I.*, temporary custody is to be given to the non-disabled parent, and a final custody determination, based on the best interests of the children, is to be made upon the recovery of the disabled parent. Consequently, assuming that the lower court in the present case found the testimony of the appellee's therapists regarding her emotional disorder to be credible and believed that her emotional disorder precipitated her departure from the family home in July 1985, it was inappropriate for the lower court to attempt to make a determination of who was primary caretaker until the initiation of the divorce proceedings.

The appellee's departure from the home in July 1985 and the circumstances surrounding it could possibly be considered an abandonment of the children with a resultant abandonment of the appellee's status as primary caretaker. However, with the introduction of evidence regarding an emotional disorder causing the departure, we are faced with a scenario arguably similar to the *J.E.I.* case. If the appellee's conduct was indeed caused by an emotional disorder, as she contends, temporary custody to the appellant with a subsequent hearing upon the appellee's recovery would be the appropriate resolution.

Indeed, by the November 3, 1988, second hearing before Family Law Master Rymer, the appellee's therapist indicated that the appellee had obtained therapy for her emotional disorder and had regularly attended follow-up support sessions designed to assist in her recovery.[5] Thus, by that hearing, her recovery had apparently progressed to the extent that a determination of the best interests of the children was appropriate. Upon hearing all evidence presented, Family Law Master Rymer determined that the best interests of the children would be served by placing them in the custody of the appellant. The lower court based its reversal of the family law master's decision upon an erroneous interpretation of the primary caretaker presumption, i.e., that such determination is to be made by inquiry into the parent having possession of the children at the time the divorce proceeding is filed and that a determination at that time was appropriate even in light of the appellee's claim of an emotional disorder.

█ We believe that, considering such factors as enumerated in *J.E.I.*, the best interests of the children would be served by placing them in the custody of their father. The children have resided with their father since January 1987. Report cards and certificates of achievement for Andrew and Adrianne are included in the record, and the children appear, by all outward indicia, to be well-adjusted to living with their father. We do not believe that their best interests would be served by disturbing their educational and familial environment.

It is unfortunate that child custody proceedings are frequently as protracted as the present case. While the rights of the parents and the stability of the children are both sacrificed during such proceedings, in the final analysis, the rights of the children must be considered paramount to the rights of the parents. It is the best inter-

---

**5.** Therapist Wayne Dickison indicated that the appellee had attended ACOA classes at Northern Panhandle Behavioral Health Center from March to May 1986. The appellee then apparently attended support group sessions for eight months thereafter.

ests of the children that must be our focus and guiding concern. *David M. v. Margaret M.*, 182 W.Va. 57, 60, 385 S.E.2d 912, 916 (1989); *see J.B. v. A.B.*, 161 W.Va. 332, 335–36, 242 S.E.2d 248, 251 (1978), *superseded by statute as stated in David M.*, 385 S.E.2d 912.

Based upon the foregoing, we believe that the trial court erred by awarding custody of the children to the appellee. Accordingly, we reverse the judgment of the Circuit Court of Marshall County and remand this case with directions that custody of the children be awarded to the appellant and with further directions that the appellee be awarded extensive and meaningful visitation rights.

Reversed and remanded with directions.