426 S.E.2d 505

Stephen W. CUMMINGS, Plaintiff
Below, Appellee,

v.

Cynthia J. CUMMINGS, Defendant
Below, Appellant.

No. 21225.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 22, 1992.

Filed Dec. 16, 1992.

Leo Catsonis, Charleston, for appellee.

Robin Jean Davis, Segal & Davis, Charleston, for appellant.

PER CURIAM:

This is an appeal by Cynthia J. Cummings from a divorce decree entered by the Circuit Court of Kanawha County on January 9, 1992. That decree awarded the appellant's former husband, Stephen W. Cummings, custody of the couple's three infant children. In the present proceeding, the appellant claims that the court erred in making that custody award. After reviewing the record and the assertions of the parties, this Court agrees with the appellant. Accordingly, the judgment of the circuit court is reversed.

In October, 1989, Stephen W. Cummings filed a divorce complaint against the appellant. He claimed that the appellant had been guilty of cruel and inhuman treatment and/or adultery, and he prayed for custody of the couple's three infant children, who were then four years, three years, and one year and four months old. He also sought an award of attorney fees.

The appellant filed an answer and counterclaim in which she sought a divorce on the grounds of irreconcilable differences, mental cruelty, and habitual drunkenness.

A number of hearings were conducted in the matter, and ultimately, on July 23, 1991, a special commissioner who had been appointed in the matter rendered a report. The special commissioner recommended that the appellant's husband, Stephen W. Cummings, be awarded the care, custody, and control of the infant children.

Both parties filed exceptions to the report, and the Circuit Court of Kanawha County overruled the exceptions. The court entered the final decree from which the appellant now appeals on January 9, 1992. In that decree, the court, in light of evidence showing that the appellant had committed adultery and in light of the fact that she had admitted the adultery, granted the appellant's husband a divorce on the ground of mental cruelty. The court also, as previously indicated, awarded the appellant's husband custody of the parties' three infant children.

In awarding the appellant's husband custody of the children, the court found that at the time of the separation of the parties and for a significant time prior thereto, the appellant's husband was the primary caretaker of the children. In reaching this conclusion, the trial court noted that the couple's youngest child was left in the care of a babysitter during week days and that the appellant's husband fed the children breakfast, usually gave the sitter directions, and served as a contact person in the case of an emergency. The court also found that the appellant's husband arrived home before the appellant, prepared meals, and fed the children. Additionally, the court found that the appellant's husband was more involved than the appellant in the children's social activities and in transporting the older children to and from school. The court concluded that although the appellant and her husband both participated in shopping for groceries, purchasing and washing clothing for the children, taking the children for medical care, and providing discipline for the children, the appellant's husband performed the significant share of the child-care functions.

In the present proceeding, the appellant claims that the trial court erred in awarding custody of the children to her former husband. She argues that contrary to the circuit court's findings, the evidence shows that she has been the primary caretaker of the children and that the record is devoid of any evidence showing that she is unfit to have custody of the children. Under the circumstances, she argues that the best interests of the children and the law of this State dictate that she have custody of the children.

In West Virginia the legal guidelines for establishing custody of very young children are rather clearly set out in *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981). In syllabus point 2 of *Garska*, the Court stated:

With reference to the custody of very young children, the law presumes that it

is in the best interests of such children to be placed in the custody of their primary caretaker, if he or she is fit.

In syllabus point 3 of the same case, the Court proceeded to state that:

The primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child.

In *Garska*, the Court, following the principles discussed in *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978), addressed at some length the factors to be considered in determining which parent has been the primary caretaker. The Court stated:

In establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for, *inter alia*, the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming, and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and (10) teaching elementary skills, i.e. reading, writing and arithmetic.

167 W.Va. at 69–70, 278 S.E.2d at 363.

■ In *Garska*, the Court also recognized the principle set forth in syllabus point 4 of *J.B. v. A.B.*, *supra*, that:

Acts of sexual misconduct by a mother, albeit wrongs against an innocent spouse, may not be considered as evidence going to the fitness of the mother for child custody unless her conduct is so aggravated, given contemporary moral standards, that reasonable men would find that her immorality, *per se*, warranted a finding of unfitness because of the deleterious effect upon the child of being raised by a mother with such a defective character.

The extensive evidence adduced in this matter shows that the parties were married in September, 1983, and separated in October, 1989. For much of the time relevant to the present proceeding, the appellant's husband worked as the general manager of a large, well-known restaurant located in Charleston, West Virginia, and the appellant worked for a computer company.

■ In the course of their marriage, the parties had three children, who are the subject of the present custody controversy. The evidence shows that immediately after the birth of each child, the appellant took approximately three months off work to care for the newborn baby and such other of the parties' children as had already been born. Although there is some evidence that the appellant's husband assisted in the evenings, the record rather clearly shows that during these months the appellant was the primary caretaker of the children and performed all child care functions.

Some three months after the birth of the first child, a babysitter, Kathy Gawthorp, was hired to care for the child. The appellant testified that she located Ms. Gawthorp. At least at times, Ms. Gawthorp cared for the child in her own home, and even though the evidence is somewhat conflicting on the extent of her activity, it is clear that the appellant was substantially involved in taking the child to, and retrieving the child from, Ms. Gawthorp's home.

The arrangement with Ms. Gawthorp did not prove entirely satisfactory because the appellant was concerned over the safety of the mountainous road leading to Ms. Gawthorp's house, and, according to her testimony, she located the Heart & Hand day-care center to care for the child. Her testimony indicates that, after enrolling the child in that center, she took the child to it and picked her up. In this period, her husband normally arrived home around six in the evening, but always worked on Monday and Friday or Saturday evenings. She prepared dinner and gave the child a bath and got her ready for bed.

When the first child was about sixteen months old, the Heart & Hand arrange-

ment was proving cumbersome, and the appellant's husband learned that the wife of one of his employees in the restaurant, one Wendy Fink, would consider working as a babysitter. He consequently invited Ms. Fink to the parties' home, where he and the appellant interviewed her and decided to hire her to babysit the child. Ms. Fink thereafter babysat the child, as well as the parties' later children, over approximately the next four years except for gaps when the appellant took time off to care for the children after the birth of her later children and when Ms. Fink took time off to have a child of her own. After Ms. Fink left, the parties employed April O'Dell to babysit the children. Ms. O'Dell's fiance, like Ms. Fink's husband, worked for the appellant's husband in the restaurant business.

The evidence on the question of who was the primary caretaker of the parties' children was somewhat conflicting, but in this Court's view showed that the appellant was much more integrally involved than the circuit court's opinion would suggest. The first factor to be considered in determining who was the primary caretaker is, as indicated in *J.B. v. A.B., supra,* who was responsible for the preparing and planning of meals. In the course of the proceedings, the appellant submitted some 203 canceled checks which showed that she had purchased food in various food stores. Additionally, she adduced the testimony of Lisa Galperin, a cashier at a local Krogers store, who testified that in the period 1985 through 1989, the appellant was a regular customer, While indicating that she had remembered seeing the appellant's husband in the express line, Ms. Galperin expressed the opinion that the appellant had checked out the most groceries. Another witness testified that she had observed the appellant frequently in the grocery store with the children. The fact that the appellant was so integrally involved in the procurement of food, as well as other evidence, suggests that the appellant was quite involved in the planning of meals.

The evidence on who actually prepared meals is somewhat conflicting. Certainly, while the appellant was home alone with the children, she prepared meals. At times, when the children were under the care of a babysitter or in daycare, the evidence shows that she also prepared breakfast. At other times, because of changes in her work schedule which required her to be at work before her husband, her husband or the babysitter or daycare center would provide breakfast. Wendy Fink, whose husband worked for the appellant's husband, testified that up until the spring of 1989, both parties fixed dinner. On the other hand, there was substantial evidence that the appellant's husband's duties required him to remain late at the restaurant on a number of nights each year, and his own testimony was that he and his wife fed the children dinner.

The second and third factors to be considered in determining who has been the primary caretaker are determining who has been responsible for bathing, grooming, and dressing the children, and for purchasing, cleaning, and caring for their clothing.

The appellant's testimony suggests that while she was home alone with the children, she bathed, groomed, and dressed them. A friend of the parties testified that she had seen the appellant bathing one of the children. On the other hand, babysitter O'Dell, whose fiance worked for the appellant's husband, testified that the appellant's husband dressed the kids "most of the time" in the morning when the appellant's schedule required her to be at work before her husband.

There was substantial evidence in the form of canceled checks, as well as testimony, showing that the appellant did most of the purchasing of clothing for the family and that she was quite involved in doing laundry.

The question of who provided medical care for the children is certainly an important factor under *Garska* and *J.B. v. A.B.* in determining who has been the primary caretaker. On this question, the appellant introduced canceled checks showing that she had paid for medical care for the children. Janet Wagoner, a receptionist for the children's pediatrician, Dr. Uy, testified that the appellant would make appointments for the children, and the checks introduced showed that the appellant had

paid on some twenty-eight occasions for such services. Ms. Wagoner's testimony suggested that the appellant's husband started bringing the children in only after the institution of divorce proceedings. One child required specialized orthopedic care, and the documents suggested that the appellant paid for such care on some nineteen occasions. The records of the orthopedist, Dr. Sale, indicated that the appellant had been instructed on the care of the child during the visits or that she had stayed with the child.

There was evidence that both parties were somewhat involved in arranging for social interaction of the children. Although there was evidence that the appellant's husband made a special effort to be with the children on Thursday evenings, there was substantial evidence showing that the appellant was involved with taking the children to parks or to be with friends or to be involved in other activities on Saturday mornings while her husband worked. She also took the children swimming on occasion, arranged parties for them, and frequently took them to Cincinnati to visit her family, which included children the age of her own children.

As previously indicated, both the appellant and her husband made daycare decisions, although there is evidence that the appellant located Kathy Gawthorp as the first babysitter and also located the Heart & Hand daycare arrangement. Her husband located Wendy Fink and April O'Dell through his employees. There is also evidence that the appellant wrote the checks to pay for the various daycare arrangements. Somewhat conflicting evidence suggests that both parties were contacted on occasion when some problem concerning the children arose.

The evidence as to who performed the remaining activities shows that both parties were involved and really predominates in favor of neither, although the evidence does indicate that the appellant purchased books for the children and suggests that she was possibly more involved in educating the children.

In examining the evidence adduced in this case, it is apparent that between the birth of the parties' first child in January, 1985, until the appellant's husband filed for divorce in October, 1989, four years and some odd months later, the appellant took a number of months off work after the birth of each of the parties' three children, and in those periods she served as the only daytime caretaker for the children. During those periods, the appellant's husband continued to work.

After the appellant returned to work, the children were principally under the care of babysitters during weekdays. In the evenings both parents were with the children, although on some evenings, as well as Saturday mornings, the appellant's husband worked, and the appellant was again the sole caretaker for the children.

It appears that during a part of the time relevant to this case, the appellant went to work before her husband and, on occasion, returned after her husband. As a consequence, the babysitters apparently had more contact with the husband. Further, two of the principal babysitters, Wendy Fink and April O'Dell, were the wife and fiance of two of the appellant's husband's employees.

A substantial portion of the testimony adduced by the appellant's husband to show that he was the primary caretaker, was the testimony of Wendy Fink and April O'Dell. In this Court's view, this testimony perforce focused on the relative roles of the parties as caretakers in the period after the babysitters arrived and before the appellant's husband left for work, and in the period after the appellant's husband returned, but before the babysitters left. In these periods, the appellant was absent from the home because of the requirements of her job. Under the circumstances, it would appear natural for a caretaker to conclude that the appellant's husband was more integrally involved with the care of the children. Additionally, since these witnesses had emotional ties with individuals who were financially dependent on the appellant's husband, there is some suggestion that their testimony was biased.

█ In a custody proceeding, the focus is not on who has been the primary care-

taker of an infant children during a particular hour of the day, or in a particular month of the child's life. Rather, it is on the overall question of who has been the primary caretaker. *See Starkey v. Starkey*, 185 W.Va. 642, 408 S.E.2d 394 (1991).

In the present case, this Court believes that the evidence shows that in the months surrounding the birth of the children, the appellant, who stayed home from work, was their primary caretaker. Further, there were evenings and Saturday mornings when she was the exclusive caretaker of the children. Although the evidence suggests that the appellant's husband was a caring father, a fair reading of the evidence shows that the appellant was, overall, more deeply involved in the care of the children than her husband. At times, when she was at home alone she was rather clearly the primary caretaker, and at the other times, when the overall evidence is read with the babysitters' testimony in appropriate context, this Court believes that it supports the conclusion that the appellant was the primary caretaker. She was integrally, and this Court believes predominantly, involved in providing meals, in grooming and dressing the children, in the provision of medical care, and in the children's social interaction. She was also at least as involved as her husband in the other activities which define a primary caretaker.

As indicated in syllabus point 2 of *Garska v. McCoy*, *supra*, the law presumes that it is in the best interest of young children to be placed in the custody of the primary caretaker if he or she is fit, and in reviewing the record in the present case, the Court fails to find evidence showing that the appellant was an unfit person to have custody of the children.[1]

Therefore, in line with the rule set forth in syllabus point 2 of *Garska v. McCoy*,

*supra*, this Court believes that the trial court erred in failing to award the appellant custody of the infant children involved in this case.

The judgment of the Circuit Court of Kanawha County is, therefore, reversed, and this case is remanded to the circuit court with directions that the court enter an order awarding the appellant custody of the infant children involved in this case and granting such other relief as may be necessary to provide for the proper support of the infant children.

Reversed and remanded with directions.

---

1. Although there were suggestions of sexual misconduct on the part of the appellant, the Court notes that syllabus point 4 of *J.B. v. A.B., supra*, acts of sexual misconduct by a mother may not be considered as evidence going to her fitness for child custody unless her conduct is so aggravated, given contemporary moral standards, that reasonable men would find her immorality, *per se*, warranted a finding of unfitness because of the deleterious effect upon the child. Furthermore, there were also suggestions of misconduct on the part of the appellee in the way of mental cruelty.

The evidence in the present case fails to show that any misconduct on the part of the appellant was of such a deleterious nature as to render her unfit to have custody of the children.