## IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE

SUSAN LYNN MARTIN BJORK )
(STROUTH), )
)
Respondent/Appellant, ) Rutherford Circuit No. 28664
)
VS. ) Appeal No. 01A01-9702-CV-00087
)
JAMES ALBERT BJORK, )
)
Petitioner/Appellee. )

APPEAL FROM THE CIRCUIT COURT OF RUTHERFORD COUNTY
AT MURFREESBORO, TENNESSEE
THE HONORABLE ROBERT E. CORLEW, III, CHANCELLOR

FILED

October 22, 1997

Cecil W. Crowson
Appellate Court Clerk

**PHILIP E. SMITH**
**ROBERT TODD JACKSON**
Nashville, Tennessee
Attorneys for Appellant

**R. STEVEN WALDRON**
**TERRY A. FANN**
**WALDRON & FANN**
Murfreesboro, Tennessee
Attorneys for Appellee

**AFFIRMED AS MODIFIED AND REMANDED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**CRAWFORD, P.J., W.S.**

**HOLLY KIRBY LILLARD, J.**

Susan Lynn Martin Bjork Strouth (Mother) appeals the trial court's orders changing temporary and permanent custody of two of the parties' minor children to Appellee James Albert Bjork (Father). For the reasons stated hereinafter, we affirm the trial court's judgment, with one modification.

The parties were divorced in December 1991 in Rutherford County. The final divorce decree awarded the parties joint custody of their three minor children, with the Mother to have primary physical custody of the children.

On January 20, 1995, the Father filed a petition seeking temporary and permanent custody of the children, who were now living in the Memphis area with the Mother and the Mother's boyfriend, Dan Strouth. In support of his petition, the Father alleged that the following material changes of circumstances had occurred since entry of the final divorce decree which warranted a change of custody: (1) the parties' 13-year-old daughter had left the Mother's home after claiming that Strouth sexually abused her; (2) the Mother was not properly supervising the children, especially the parties' four-year-old son, Ben; and (3) the Mother and Strouth frequently argu

A hearing on the issue of temporary custody took place on January 31 and February 2, 1995. At the hearing, the Father testified that the Mother had complained to him on several occasions that Strouth had been physically abusive toward her. During one of these episodes, the Mother called 911. On at least one occasion, the Mother told the Father that she was moving out of Strouth's house into an apartment, but she failed to carry out this plan.

The daughter corroborated the testimony concerning Strouth's violent outbursts. The daughter testified that Strouth had a bad temper and that she had witnessed Strouth hitting the Mother and pushing her around. During one incident, the daughter heard the Mother scream her name. When the daughter entered the Mother's bedroom, she observed that Strouth had the Mother pinned on the bed. On several occasions, the Mother promised the daughter that she would leave Strouth, but the Mother never fulfilled these promises. The daughter also testified that, when she was only 11 and 12 years old, the Mother and Strouth frequently left her alone at night with her younger brothers. The daughter testified that, during one period, the Mother and Strouth did this almost every night. The daughter also was responsible for babysitting eight-year-old Brian every day after school and during the summer break.

2

At the hearing, two of the Mother's neighbors testified on behalf of the Father. The neighbors had lived down the street from the Mother and Strouth for over a year. During that time, the neighbors often observed four-year-old Ben playing outside without supervision. The Mother and Strouth lived on a cove, and Ben frequently rode a toy jeep in the street without supervision. On one occasion, the neighbors observed Ben almost get hit by a car. When one of the neighbors related this incident to the Mother, the Mother admitted that Ben was not being properly supervised. This same neighbor testified that Ben frequently visited her house by himself to play with her son. Although Ben spent a significant amount of time at the neighbor's house, during his visits the Mother never called the neighbor to check on her son. The neighbors also had observed the Mother and Strouth going out "night after night" and leaving the three children home alone. This pattern continued for several months.

The Mother admitted previously telling the daughter and the Father that she was moving out of Strouth's house and terminating her relationship with Strouth. Most recently, the Mother told the daughter over Labor Day weekend that she was moving out of Strouth's house. Despite her promise to the daughter, the Mother still was living with Strouth at the time of the temporary custody hearing. In her testimony during the hearing, the Mother again represented that she was moving out of Strouth's house and was not going to date Strouth anymore. Later in her testimony, however, the Mother admitted that she and Strouth had discussed marriage. Although the Mother attempted to minimize any acts of violence in the home, the Mother admitted that she called 911 once when she and Strouth "were arguing." The police responded to the call but did not arrest anyone. The Mother also admitted that Strouth's temper had caused problems in their relationship and that Strouth had struck her approximately three times. The Mother blamed this problem on stress caused by a divorce that Strouth was going through at the time. The Mother testified that Strouth currently was taking medication to control his temper.

Strouth also testified, admitting that he had slapped the Mother three times during the course of their relationship and that he had slapped the Mother the night she called 911. Strouth was not sure where the children were during these episodes, but he thought that at least one of the children was upstairs in the house during the 911 incident. Despite these admissions, Strouth denied having a bad temper. Strouth claimed that he was treated, not for his bad temper, but for "acute anxiety" relating to his divorce and his job. Finally, Strouth testified that the Mother was moving out in a couple of weeks, not to get away from Strouth, but because they had agreed to live apart until they married.

On February 14, 1995, the trial court entered an order continuing the award of joint custody but temporarily awarding the Father primary physical custody of the parties' children pending a final custody hearing. The trial court awarded the Father temporary custody of the parties' 13-year-old daughter based on the parties' agreement at the temporary custody hearing. The trial court awarded the Father temporary custody of the parties' sons based on the evidence of violence and unrest within the Mother's home, as well as evidence of the lack of supervision in the home.

In March 1995, the Mother filed a motion for appointment of a guardian ad litem to represent the interests of the parties' two sons. As grounds for the motion, the Mother alleged that the sons had not adapted well to the sudden change in their lives caused by the trial court's temporary custody order. Although the Mother's motion referenced only the two sons, the trial court's subsequent order appointed a guardian ad litem to represent the interests of all three of the parties' children.

On October 5, 1995, the Father filed a motion for temporary child support. The Father's motion apparently was scheduled for a hearing on November 3, 1995. Before the scheduled hearing could take place, however, the Mother's attorney filed a motion to withdraw as counsel for the Mother. The trial court granted the motion to withdraw on December 27, 1995.

A final hearing was conducted on March 20 and 21, April 19, and June 22, 1996, to determine custody of the parties' two sons. The previous summer, the Mother had married Dan Strouth. Their relationship appeared to have stabilized and to have improved significantly. The Mother testified that she and Strouth had learned how to communicate more effectively and that they now had a positive, strong relationship.

By the time of the final custody hearing, however, the parties' two sons had been residing with the Father for over a year. Both sons attended the same elementary school where the Father taught fifth grade. The sons had made new friends, were doing well in school, and were involved in sports and church activities. The Father also had remarried the previous summer, and he and his new wife had purchased a home in Murfreesboro. The sons had developed a close relationship with the Father's new wife, who was also a teacher. Both sons were healthy, and they were treated by the same pediatrician they saw when the parties were still married.

4

In July 1996, the trial court entered its final order transferring primary physical custody of the parties' three children to the Father.[1] The trial court's judgment also (1) ordered the Mother to begin paying child support to the Father in the amount of $825 per month; (2) awarded the Father an additional $3,037.81 for retroactive child support from March 20, 1996, the date the final custody hearing began; (3) ordered the Mother to pay the guardian ad litem's fees in the amount of $3,712; and (4) ordered the Mother to pay court costs.

The Mother appeals, contending that the trial court erred in awarding the Father temporary custody of the parties' two sons after the 1995 temporary custody hearing; in awarding the Father permanent custody of the parties' sons after the 1996 final custody hearing; and in requiring the Mother to pay the guardian ad litem's fees and court costs. The Father also has presented issues for this court's review, including whether the trial court erred in failing to award him child support retroactive from October 5, 1995, the date the Father filed his motion for temporary child support, and whether the trial court erred in denying the Father's request for an award of attorney's fees.

On appeal, the Mother's primary contention is that the record fails to establish a material change of circumstances which would warrant changing custody of the parties' two sons to the Father. In a proceeding to modify a prior custody order, the party seeking a change of custody has the burden of proving a material change in circumstances compelling enough to warrant such a change. See Musselman v. Acuff, 826 S.W.2d 920, 922 (Tenn. App. 1991); see also T.C.A. § 36-6-101(a)(1) (1996) (providing that trial court retains jurisdiction over custody orders subject to such changes or modification as "exigencies" of case may require). A change of circumstances warranting a modification of custody includes "any material change of circumstances affecting the welfare of the child or children" and requires a showing of "new facts or changed conditions which could not be anticipated by the former decree." Dalton v. Dalton, 858 S.W.2d 324, 326 (Tenn. App. 1993). The trial court's finding of a change of circumstances does not end the inquiry, however, because the trial court's determination of custody still must be guided by its consideration of the best interest of the child. Dantzler v. Dantzler, 665 S.W.2d 385, 387 (Tenn. App. 1983).

---

[1]At the final custody hearing, the parties again agreed that the Father should have custody of the daughter. Accordingly, the custody issues on appeal relate only to the parties' two sons.

5

In Massengale v. Massengale, 915 S.W.2d 818 (Tenn. App. 1995), this court set forth the applicable standard for reviewing a trial court's determination of the issue of changed circumstances in a custody modification proceeding:

> In order to justify a change in a custodial arrangement, there must be "such a change in circumstances as will directly affect the welfare of the minor." Dailey v. Dailey, 635 S.W.2d 391, 393 (Tenn. App. 1981). As in all non-jury cases, a trial court's determination on this issue is reviewed by us de novo; however, the record developed below comes to us accompanied by a presumption of correctness that we must honor unless the evidence preponderates against the findings of fact supporting the lower court's judgment. Hass v. Knighton, 676 S.W.2d 554, 555 (Tenn. 1984). In making our de novo review, we "do [ ] not pass on the credibility of witnesses." Bowman v. Bowman, 836 S.W.2d 563, 567 (Tenn. App. 1991). "Credibility is an issue for the trial court who saw and heard the witnesses testify and is therefore in the premier position to determine credibility (citation omitted)." Id.

Massengale, 915 S.W.2d at 819.

Applying the foregoing standard, we affirm both the trial court's decision to award the Father temporary custody of the parties' sons during this lawsuit and the court's decision to award the Father permanent custody at the lawsuit's conclusion. Our review of the hearing on the temporary custody issue reveals ample evidence of a material change of circumstances sufficient to trigger an inquiry into the best interest of the children. See Gallagher v. Adkins, 1988 WL 34085, at **3-4 (Tenn. App. Apr. 15, 1988). Specifically, this evidence indicated that the Mother and the man with whom she was living, Dan Strouth, had a volatile relationship characterized by violence on his part and indecision on hers. The Mother and Strouth admitted to several incidents involving physical abuse, including the one which culminated in the 911 call to police. The daughter witnessed some of these acts of violence, and at least one of the sons was in the house during the 911 incident. On several occasions, the Mother complained to the Father that Strouth had been physically abusive toward her, and at one point she indicated that she planned to leave Strouth. At other times, the Mother promised the daughter that she would leave. Despite these promises, the Mother had not moved out of Strouth's house to establish a separate home for herself and the children.

In addition to this evidence, witnesses testified that four-year-old Ben frequently was permitted to play outside for extended periods of time without adult supervision and that, on at least one occasion, he was almost hit by a car while riding a toy jeep in the cove. Witnesses also testified that the Mother and Strouth frequently left all three children at home without adult supervision. We conclude that, based on the evidence of violence and

6

unrest within the Mother's home, as well as evidence of the lack of supervision in the home, the trial court properly awarded the Father temporary custody of the parties' two sons pending these custody proceedings. See Gallagher v. Adkins, 1988 WL 34085 (Tenn. App. Apr. 15, 1988) (affirming awards of temporary and permanent custody to father based, in part, on marital problems and physical abuse experienced by mother at time of temporary custody hearing); see also Smith v. Smith, No. 03A01-9508-CH-00292, 1996 WL 33177 (Tenn. App. Jan. 30, 1996) (affirming change of custody where evidence showed lack of supervision, turmoil, and violence in mother's home); Gogus v. Tritschler, No. 01A01-9508-CH-00373, 1996 WL 23366 (Tenn. App. Jan. 24, 1996) (affirming change of custody based, in part, on evidence that mother's present husband physically abused her in their home), perm. app. denied (Tenn. May 28, 1996); Dennis v. Dennis, 1990 WL 207392 (Tenn. App. Dec. 19, 1990) (affirming change of custody where mother had been victim of assault and battery by present husband, mother admitted that husband had violent temper, and mother and husband had reconciled and separated twice).

We further conclude that, in making its final custody determination, the trial court properly considered evidence of the circumstances within the Mother's home at the time of the temporary custody hearing, as well as evidence of the sons' placement with the Father while these proceedings were pending. In Gallagher v. Adkins, 1988 WL 34085 (Tenn. App. Apr. 15, 1988), the trial court awarded the father temporary custody of the parties' son based on evidence that the mother was experiencing marital difficulties, that the son had witnessed his mother being physically abused by her husband, and that the son appeared depressed and malnourished. Id., at **3-4. Although the mother's circumstances had improved significantly by the time of the final custody hearing,[2] the trial court still awarded the father permanent custody of the parties' son based, in part, on evidence concerning the son's placement with the father pending the final custody hearing. Id., at *4. The son was attending school, where he was described as a normal student and a leader. The son did well in his class work and had made many friends. Moreover, the son had developed a good relationship with his father's new wife and her son. Id. This court affirmed the trial court's decision, holding (1) that the evidence at the initial custody hearing demonstrated a sufficient change in circumstances to trigger the trial court's inquiry into the best interest of the parties' son; and (2) that the evidence at the final custody hearing supported the trial court's finding that the son's best interest would be served by awarding permanent custody to the father. Id., at **3-4.

---

[2] See Gallagher v. Adkins, 1988 WL 34085, at *7 (Koch, J., concurring).

7

In the present case, the trial court's written opinion, filed contemporaneously with its final custody order, reveals that the court properly conducted a thorough analysis of both the circumstances existing at the time of the temporary custody hearing and those occurring since the initiation of these proceedings:

> The Court has recognized that both parties have demonstrated love, affection, and emotional ties with the minor children.... Both parents have a disposition to provide materially for the minor children, although the evidence appears perhaps that the father has been more conscientious in his material provisions for the children.
>
> The Court is also to consider the importance of continuity in the lives of the children. This is a difficult issue because the case in question has been pending for a lengthy period of time. Certainly the Court cannot ignore factors which have occurred since the initial Order of the Court removing the children from the home of the mother and placing them with the father, but for purposes of the legal issue of continuity, the Court must consider the cause as of the time of the original filing, and thus consider continuity of placement with the mother in Memphis. Regrettably, and with all due respect to the mother, the evidence both initially and presently showed a disharmonious relationship at the time of the initial temporary order, and a lack of a "stable, satisfactory environment" contemplated by the statute.[3] The mother has very sincerely expressed to the Court her regret in allowing the children to reside in the circumstances in Memphis with Mr. Strouth, out of wedlock, during a time when the relationship between the mother and her present husband was relatively unstable, during times when she was uncertain herself as to whether she should continue the relationship with Mr. Strouth, and during periods of physical confrontation. The evidence presently shows that the home of the mother has stabilized. The home of the father has been stable throughout the time of these proceedings. Both parties are physically and mentally healthy. The children certainly have demonstrated an ability to succeed in the school system either in Murfreesboro or in Memphis. The Court has considered the preference of the oldest child, and similarly has considered the fact that it is generally considered to be desirable that minor siblings reside under the same roof, and not be physically separated.
>
> . . . .
>
> The evidence certainly shows that both parents and stepparents are hardworking professional people, capable of attaining responsible jobs. [The mother] has perhaps demonstrated some lack of judgment, as previously stated, which she regrets. She also has demonstrated perhaps some lack of decisiveness in her current marital relationship. The evidence appears to show that perhaps the father is in a better position to establish provisions for the religious education of the minor children. Both stepparents appear to have more advantages than disadvantages. The stepmother, a teacher, appears to have a good relationship with all three of the children, and provides assistance to them with their school work. The relationship of the stepfather, as previously stated, is certainly strained with regard to the daughter,[4] yet it appears that his relationship with the two sons is a good one. Both families are struggling financially, which affects their abilities to provide an environment physically for the minor children. Certainly, however, it appears to the Court that the homes established by both parties are very comfortable.

---

[3] See T.C.A. § 36-6-106(3) (1996).

[4] The custody of the parties' daughter is not at issue in this appeal. In fairness to Mr. Strouth, however, we feel compelled to mention that, in its written opinion, the trial court specifically found that the allegations of sexual abuse were not proved.

> Considering all of these factors, it appears to the Court that the custody of the minor children should remain with the father.

The foregoing excerpts demonstrate that the trial court was fully cognizant of both the legally relevant factors in this case and the difficulty of the decision with which it was faced. After a careful review of the record, we can discern no basis to disturb the trial court's ruling.

In holding that the trial court properly considered evidence of the sons' temporary placement in making its final custody determination, we do not mean to imply that any temporary placement will have such legal significance. Instead, we limit our holding to cases where, as here and in <u>Gallagher</u>, the temporary custody arrangement was properly ordered after an evidentiary hearing at which the petitioner demonstrated a change in circumstances sufficient to trigger the trial court's best interest analysis. <u>Gallagher v. Adkins</u>, 1988 WL 34085, at **3-4.[5] In so limiting our holding, we are mindful that temporary custody arrangements

> [S]hould be for the shortest duration possible and should not be used as a substitute for a permanent custody decision.
>
> Temporary custody should . . . be used with caution because of its practical effect on permanent custody decisions. When permitted to continue over a long period, temporary custody creates a "new status quo," <u>Plowman v. Plowman</u>, 597 A.2d 701, 706-07 (Pa. Super. Ct. 1991), and permits the custodial parent to establish a track record that heightens his or her chances of obtaining permanent custody. <u>J.E.I. v. L.M.I.</u>, 314 S.E.2d 67, 72 (W. Va. 1984); 2 <u>Child Custody & Visitation Law and Practice</u> § 8.01[2][a] (John P. McCahey, ed. 1992).

<u>King v. King</u>, No. 01A01-9110-PB-00370, 1992 WL 301303, at *2 (Tenn. App. Oct. 23, 1992). Nevertheless, this court also has recognized that "[c]ircumstances requiring temporary custody arrangements will inevitably arise, and therefore, trial courts should have the prerogative to make temporary custody decisions." <u>Id</u>. We conclude that the trial court appropriately exercised its prerogative when it issued the temporary custody order in this case.

As for the parties' arguments concerning fees and costs, we conclude that the trial court did not abuse its discretion in requiring the Mother to pay the guardian ad litem's fees and court costs. <u>See McKeehan v. McKeehan</u>, No. 02A01-9407-CV-00165, 1995 WL 695124, at *3 (Tenn. App. Jan. 11, 1996); T.R.C.P. 17.03. We also affirm the trial court's decision to deny the Father's request for an award of attorney's fees. Tennessee Code Annotated section 36-5-103(c) governs awards of attorney's fees in proceedings relating to child support and child custody:

---

[5] <u>But see Gallagher v. Adkins</u>, 1988 WL 34085, at *6 (Koch, J., concurring) (opining that evidence did not provide sufficient basis to issue temporary restraining orders changing custody to father pending final modification hearing).

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

T.C.A. § 36-5-103(c) (1996).

This statute authorizes an award of attorney's fees to a party who successfully pursues or defends a change of custody petition. See D v. K, 917 S.W.2d 682, 686 (Tenn. App. 1995); Gaddy v. Gaddy, 861 S.W.2d 236, 241 (Tenn. App. 1992); Akins v. Akins, 805 S.W.2d 377, 379-80 (Tenn. App. 1990); Fenley v. Fenley, No. 03A01-9604-CH-00121, 1996 WL 469683, at *4 (Tenn. App. Aug. 19, 1996). As the Father acknowledges on appeal, however, a party's right to an award of attorney's fees under section 36-5-103(c) is not absolute. Deas v. Deas, 774 S.W.2d 167, 169-70 (Tenn. 1989). Instead, the statute provides that such an award is within the trial court's discretion. T.C.A. § 36-5-103(c) (1996); see Sherrod v. Wix, 849 S.W.2d 780, 785 (Tenn. App. 1992); Archer v. Archer, 907 S.W.2d 412, 419 (Tenn. App. 1995); Brewer v. Brewer, 869 S.W.2d 928, 936 (Tenn. App. 1993); see also Florian v. Edenfield, No. 03A01-9406-CV-00217, 1996 WL 310018, at *5 (Tenn. App. June 11, 1996) (holding that prevailing party in child modification proceeding is not "entitled" to award of attorney's fees because such award lies within trial court's discretion). The trial court's award of attorney's fees, or denial of an award, need only be just and equitable under the circumstances. Sherrod v. Wix, 849 S.W.2d at 785.

We conclude that the trial court did not abuse its discretion in denying the Father's request for attorney's fees in this case. These custody proceedings have now lasted for over two and one-half years, during which both parties have incurred substantial legal fees. According to his counsel's affidavit, for example, the Father's anticipated legal fees through the final custody hearing totaled over $11,000. The Mother estimated her attorney's fees to be about $20,000. The evidence at the final custody hearing revealed that both parties have a limited ability to pay their own attorney's fees, never mind the other party's fees. We recognize that ability to pay is not the determinative factor for an award of attorney's fees under section 36-5-103(c). Sherrod v. Wix, 849 S.W.2d at 785. Under the circumstances of this case, however, we hold that the trial court's decision to require each party to pay its own attorney's fees was just and equitable. See Archer v. Archer, 907 S.W.2d 412, 419 (Tenn. App. 1995)

(denying award of attorney's fees under section 36-5-103(c) where neither party appeared able to afford its own attorney's fees). We likewise deny the Father's request for an award of attorney's fees on appeal.

We agree, however, with the Father's contention that he is entitled to child support retroactive from October 5, 1995, the date he filed his motion for temporary child support. Both parents have an equal and joint obligation to support their minor children. Merrill v. Merrill, 216 S.W.2d 705, 706 (Tenn. 1948); Allison v. Allison, 638 S.W.2d 394, 396 (Tenn. App. 1982); Atchley v. Atchley, 194 S.W.2d 252, 253 (Tenn. App. 1945). This obligation exists even if an order awarding child support has not yet been entered. Roble v. Roble, 295 S.W.2d 817, 818 (Tenn. App. 1956). Accordingly, we modify the trial court's judgment to provide that the Mother's child support obligation shall be effective as of October 5, 1995. See Archer v. Archer, 907 S.W.2d 412, 418 (Tenn. App. 1995). In making this modification, we distinguish this case from cases involving the modification of a parent's child support obligation, wherein the trial court has the discretion to order the modification effective as of the date of the modification petition, the date of the final hearing, or any appropriate date in between. See Gonsalves v. Roberts, 905 S.W.2d 931, 932 (Tenn. 1995); Brown v. Heggie, 876 S.W.2d 98, 100 (Tenn. App. 1993); Natelson v. Natelson, No. 03A01-9505-CH-00156, 1995 WL 699968, at *3 (Tenn. App. Nov. 29, 1995); Presson v. Presson, No. 03A01-9312-CV-00452, 1994 WL 446894, at *7 (Tenn. App. Aug. 19, 1994); Elkins v. Elkins, No. 02A01-9203-CH-00061, 1992 WL 340747, at *4 (Tenn. App. Nov. 24, 1992); see also T.C.A. § 36-5-101(a)(5) (1996). In modification proceedings, the non-custodial parent is required by a previous court order to make at least some payment toward his or her support obligation during the pendency of the proceedings.

With the exception of the foregoing modification, the trial court's judgment is hereby affirmed. This cause is remanded for the trial court to determine the additional amount of retroactive child support to which the Father is entitled and for further proceedings consistent with this opinion. Costs of this appeal are taxed to Appellant, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

11

_____

CRAWFORD, P.J., W.S.

_____

LILLARD, J.